DA 12-0782

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 294N

TUNGSTEN HOLDINGS, INC.,

      Plaintiff and Appellant,

  v.

DAVID FREYDER,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV 06-634C
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Thane P. Johnson; Johnson, Berg & Saxby, PLLP; Kalispell, Montana

      For Appellee:

          Richard De Jana; Richard De Jana & Associates, PLLC; Kalispell, Montana

Submitted on Briefs:  September 4, 2013
Decided:  October 8, 2013

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Pursuant to Section I, Paragraph 3(d), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2      Tungsten Holdings, Inc. (Tungsten) appeals from the order of the Eleventh Judicial District Court determining the location of the easement granted in the deed to Tungsten's property. Tungsten is the owner of 80 acres: 40 acres are located immediately to the north of the other 40 acres (collectively Tungsten Property). David Freyder (Freyder) is the owner of 20 acres (Freyder Property). The Freyder Property is not contiguous to the Tungsten Property, but lies to the east of the Tungsten northern 40 acres, separated by a 20 acre parcel (Intervening Property). Neighboring property owners use an access road known as Moose Crossing that travels in a northerly direction, just barely crossing into the eastern boundary of the Freyder Property, before turning west and crossing property to the north. There is also a newer road along the southern boundary of the Freyder Property known as Apgar View.

¶3      Tungsten filed its complaint asserting Freyder was interfering with use of its easement. It asserted an easement through the entirety of the Freyder and Intervening Properties not along Moose Crossing or Apgar View, but along a small trail through the

2

woods just north of the Freyder house, about midway between the other two access roads. Alternatively, Tungsten requested the court declare that it had an easement by necessity to cross the Freyder and Intervening Properties. Freyder answered that the easement granted to Tungsten was not on the road it claimed, but along Moose Crossing. The owner of the Intervening Property was never a party to the case. After 6 years of pleadings, motions, and ultimately a bench trial, the District Court held that Tungsten's easement was along Moose Crossing, traveling to the eastern border of the Freyder Property before heading north and around the Freyder and Intervening Properties and dropping into the northeast corner of the Tungsten Property. Because the District Court determined that access existed, it denied Tungsten's claim to an easement by necessity. This appeal followed.

¶4     After thorough review of the transcript and the District Court record, the pertinent facts are as follows. By December 1968, Carrol and Myrna Wright (Wrights) owned approximately 520 contiguous acres, including the Freyder, Tungsten, and Intervening Properties (collectively Subject Properties), located just southwest of where the Middle Fork diverges from the North Fork of the Flathead River (Wright 520 acres). This land is between sections of the Flathead National Forest and, at the time of the Wrights' ownership, had to be accessed by use of a Forest Service "jeep trail."

¶5     Between 1973 and 1978, the Wrights sold the 80 acres immediately to the north of the Subject Properties in three transactions.[1]   Only one deed specifically reserved an easement while the other two only noted that access to the property was by use of an "existing road."  On August 31, 1978, shortly after the last of these parcels was sold, the Wrights filed a Declaration of Easement (Declaration).  The Declaration stated that the easement "follows as closely as possible jeep trails and the description thereof will be in general terms as it follows *existing rights of way*."  (Emphasis added.)  The Declaration then set out a more thorough description of the easement describing the direction of travel through various portions of the Wright 520 acres.  The Declaration specifically listed as a benefitted tract (dominant estate) all of Wrights' remaining land including the Subject Properties, though it did not describe the easement as crossing any of the Subject Properties with the exception of it touching the eastern boundary of the Freyder Property. The description follows what is now Moose Crossing, however it does not describe the portion of road that passes through the previously sold properties to the north of the Subject Properties.

¶6     On September 8, 1978, the Freyder Property was conveyed to Freyder's predecessor in interest.  The conveyance reserved a right to use "an existing 'jeep trail' which crosses a portion" of the property.  In 1987, Tungsten's predecessors in interest acquired the Tungsten Property.  The northern 40 acres and the southern 40 acres of the

[1] In 1977, after 60 acres had been sold, the Wrights granted interests in nearly all the remaining 460 acres to Newman and Grisley.  Subsequently, Newman and Grisley were parties to all transactions on the remaining joint land.  As these conveyances are not relevant to the case at bar, we continue to refer only to the Wrights as to the entire 520 acres.

Tungsten Property were acquired through two separate contracts for deed, approximately six months apart. The deed for the northern 40 acres (the property with a border adjoining the Intervening Property) included use of an easement "along an *existing jeep trail* which crosses a portion of the" Freyder and Intervening Properties. (Emphasis added.) The deed for the southern 40 acres included use of an easement with a different description.

¶7     In 1996, Freyder's predecessor in interest, the Nichols, executed an Exchange Easement with the owner of the Intervening Property allowing the owner to construct a road through the Freyder Property along the southern boundary into the Intervening Property. The road was subsequently created and referred to as Apgar View.

¶8     In February 2002, Tungsten purchased the Tungsten Property "subject to and together with all easements, restrictions and covenants apparent or of record." It brought this action in 2006 asserting its right to use a path through the Freyder Property between Moose Crossing and Apgar View. Prior to trial, Tungsten agreed that its predecessors in interest had used a different road for access than the one they were now claiming.

¶9     A bench trial was held on October 19, 2010. Timothy Rooney (Rooney), a principal of Tungsten, was the only witness on behalf of Tungsten. Rooney presented aerial forest service photographs from 1964 and 1981, and Google maps from 1991, 2003, 2004, 2005, and 2009, alleging they showed the path through the trees it claimed as the easement. Rooney traveled the alleged path three times between 2002 and 2006. Rooney admitted that since the first time he came to the property there was a string or

ribbon blocking the path. He also admitted that Moose Crossing is "the most evident" road, and is likely the one referenced as "the existing road" in all the deeds for the properties to the north of the Subject Properties.

¶10 Freyder called Brenda Nichols (Nichols), Andrew Hohnberger (Hohnberger), and Tom Freyder (Tom). Nichols testified that her parents bought the Freyder Property in 1988, and she subsequently purchased it from them in 1996. Prior to 1996 her family used the property often, and after 1996 she lived on the property for five years. She testified with the aid of a map she had drawn for a prior, unrelated suit. This map showed the property boundaries for the Wright 520 acres and surrounding area, as well as what she claimed were the existing roads and rights of way. To her knowledge, the only jeep trail that existed for access was Moose Crossing. She also testified that the path alleged by Tungsten to be the easement was created by a logger that her parents hired in the 1990s. After moving onto the property permanently in 1997, she had some work done to flatten the path and remove large rocks so she could access another portion of her property.

¶11 Hohnberger is a real estate broker who was familiar with the Wright property. His father had been a real estate agent involved in selling portions of the Wright 520 acres since 1984. Hohnberger often went with his father to the Wright 520 acres, including the Tungsten Property. Hohnberger was only five when he first started visiting the land, but testified that since 1986 he had visited the area and traveled the existing jeep trail approximately five times per year. Hohnberger also used the map created by Nichols to

aid his testimony. Hohnberger testified that in all his visits to the area, the only road he ever knew of for access was Moose Crossing. He never saw a path traveling in the location alleged by Tungsten until approximately the mid-1990s when Nichols created the logging road.

¶12 Tom, Freyder's brother, is a partial owner and manager of the Freyder Property. Tom testified that neither he nor his brother would have a problem with Tungsten using the Moose Crossing access road or the Apgar View road along the southern boundary.[2]

¶13 The District Court found that the easement traveled along Moose Crossing, as described in the Declaration, and continued through portions of the properties to the north of the Subject Properties before dropping into the northeast corner of the Tungsten Property. Tungsten argues that the District Court erred for several reasons. First, it argues that as a matter of law the easement cannot exist where the court determined because by the time the Tungsten Property was severed from the Wright common ownership, it had already sold all the property to the north. Second, it argues that there is not substantial credible evidence to support the District Court's finding. Finally, it argues that if the easement is not found to be where it alleges, the District Court erred by not granting it an easement by necessity. We address each of these arguments in turn.

¶14 To support its argument that there cannot be an easement granted through the property to the north of the Subject Properties, Tungsten points to the deeds conveying the two parcels that did not include an express reservation of an easement. Tungsten has

---

[2] This case does not decide whether an enforceable easement exists for Tungsten to use Apgar View as that easement crosses through the property of a party not before the court.

provided no authority to support its argument that no easement could exist "as a matter of law" through these properties simply because the easement was not *expressly* reserved. *See Blazer v. Wall*, 2008 MT 145, ¶ 26, 343 Mont. 173, 183 P.3d 84 (listing the types of easements recognized in Montana).

¶15 Tungsten's second argument is even more strained. First, it argues that the District Court "primarily" based its decision on pleadings of Tungsten's predecessors in interest from an earlier, unrelated case. The District Court entered a finding that in 2000, Tungsten's predecessors in interest "specifically pled the location" of the existing jeep trail to be where it found the easement. A review of all the pleadings, attachments, exhibits, and testimony before the District Court reveals no statement or pleading from Tungsten's predecessors in interest. Rather, the reference to the earlier case, the substance of which is not in the record, is in regard to the map used by Freyder's witnesses. The map was apparently created for a prior case in which Nichols and several other former Wright property owners, allegedly including Tungsten's predecessors in interest, were all plaintiffs. Nonetheless, in this case, both Hohnberger and Nichols testified that the map accurately depicted the area and what they have always understood to be the location of the road easement. While we cannot confirm from the record that the District Court's statement was correct that the location was specifically pled and agreed to by Tungsten's predecessors in interest, we find no error with the District Court's reliance upon a map created for a prior, unrelated proceeding when it was

properly authenticated, identified, and offered for purposes of illustrating the witnesses' testimony herein.

¶16 Tungsten also repeatedly argues, without citing legal authority, that the District Court erred by relying on the understanding of "some subsequent person in the chain of title," rather than discerning the intent of the Wrights when they first conveyed the property. However, Tungsten does not identify what evidence could have been produced to prove the location of the easement when the original grantor is not available.

¶17 The evidence presented at trial was that since approximately 1984 the only access road to the Tungsten property travels in the location found by the District Court. Two separate witnesses testified to their frequent and repeated personal observation of this access road for nearly three decades. Tungsten itself agreed that its predecessors in interest used a different path than the one it claims for access to the Tungsten Property. Additionally, Nichols testified that the path Tungsten claims was not created until sometime in the 1990s. Hohnberger confirmed this in his testimony. Clearly, there was substantial evidence for the District Court to find that the easement described in the deed was along Moose Crossing.

¶18 A "subsequent purchaser of the property" itself, Tungsten asks this Court to reverse the District Court's factual findings as clearly erroneous based solely upon its observations and understanding of the location of the easement. Tungsten's only witness, Rooney, had never been to the property until 2002. Tungsten's only historical evidence was aerial photographs showing what may or may not be a path. This evidence alone is

9

not sufficient to leave this Court "with a definite and firm conviction" that the District Court's reliance on direct testimony about the creation of the path was a mistake. *Blazer*, ¶ 22.

¶19 Tungsten's final argument, claiming an easement by necessity, is implausible. While recognizing that an easement by necessity requires "strict necessity" at the time the property was severed from a common ownership, Tungsten presented absolutely no evidence at trial to establish such necessity. In fact, Tungsten conceded that its predecessors in interest used a different route to access the property and thus admitted that access exists other than by the logging path it has claimed.

¶20 We have determined to decide this case pursuant to Section I, Paragraph 3(d) of our Internal Operating Rules, which provides for noncitable memorandum opinions. The issues in this case are factual and the District Court's findings of fact are supported by substantial evidence. Any questions of law are controlled by settled law.

¶21 Affirmed.


/S/ JIM RICE

We concur:


/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON